UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CMC TELECOM, INC and
GRID 4 COMMUNICATIONS, INC.,
                    Plaintiffs,
                                                    No. 1:07-cv-319

-v-
                                                    HONORABLE PAUL L. MALONEY

MICHIGAN BELL TELEPHONE CO., et al.,
                    Defendants.


                                OPINION

        Plaintiff CMC Telecom, Inc. and Plaintiff Grid 4 Communications, Inc. (Plaintiffs) allege

Defendant Michigan Bell Telephone Company, d/b/a AT&T Michigan (Defendant or Defendant

AT&T) violated the Telecommunications Act of 1996 (Act), 47 U.S.C. §§ 151 *et seq*.  The

controversies this Court must resolve all relate to individual case basis (ICB) contracts offered by

Defendant AT&T to various non-residential customers.[1]  Plaintiffs urge this Court to find portions

of an order issued by Defendant Michigan Public Service Commission (MPSC) violates federal law.

Plaintiffs challenge four holdings in the MPSC Order, all concerning Defendant AT&T's ICB related

practices.

        Plaintiffs, along with the Michigan Communications Carriers Association, filed a complaint

with the MPSC on August 1, 2006.  An Administrative Law Judge (ALJ)  heard oral argument on

a motion to dismiss and later issued a Proposal for Decision (Proposal).  The parties filed exceptions

to the Proposal and replies.  The MPSC issued its order on February 27, 2007.  Plaintiffs then filed

this complaint and request for declaratory relief on March 27, 2007.  Then presiding senior Judge

────────────────

        [1]AT&T does not currently negotiate residential ICBs.  (Exhibit E to Plaintiffs' Reply
Brief at 20 - Testimony of Deborah Niziolek).

Wendell A. Miles issued a case management order in July 2007, providing a schedule for the parties to brief the "appeal" portion of the case. The order stated "the court shall initially determine whether the MPSC Order and AT&T Michigan's actions violated federal law." (Dkt. No. 17 - CMO at 1.) If the court issued a ruling favorable to Plaintiffs, a subsequent case management order would issue scheduling deadlines for discovery regarding damages and the remainder of the case. *Id.* After the case was reassigned to the undersigned, oral argument was held. The court invited the parties to file additional briefs, which all the parties have done.

## I. FEDERAL TELECOMMUNICATIONS ACT OF 1996

Congress enacted the Telecommunications Act of 1996 in order to introduce competition into local telecommunications markets. *Southwestern Bell Tel. Co. v. Apple*, 309 F.3d 713, 714 (10th Cir. 2002). Before the Act, local telephone service was a regulated monopoly where the provider was given protection from new companies seeking entry into the market. *Id.* Under the Act, incumbent local exchange carriers (ILECs), whose monopoly had been protected, were given various affirmative duties designed to promote competition and introduce new carriers into the market. *Id.* The ILECs, as owners of the local exchange network, had to provide network access to competing local exchange carriers (CLECs). *Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc.*, 339 F.3d 428, 430 (6th Cir. 2003).

One of the new duties imposed on ILECs was the obligation to sell telecommunications services it offered at retail to their competitors, the CLECs, at wholesale rates for resale to consumers. 47 U.S.C. § 251(c)(4)(A). Under the resale duty, an ILEC is prohibited from imposing unreasonable or discriminatory conditions or limitations on the resale of the telecommunications services. 47 U.S.C. § 251(c)(4)(B). The FCC has also promulgated regulations implementing the

Telecommunications Act. ILECs must make their services available for resale on terms and conditions that are reasonable and nondiscriminatory. 47 C.F.R. § 51.603(a). Any service offered by an ILEC at retail must be offered at wholesale rates to CLECs for resale. 47 C.F.R. § 51.605(a). Several exceptions exist for the broad requirement under section 605(a), such as cross-class selling (e.g. CLECs may not resell business services to residential users) and short term promotions (ILECs need not offer promotional prices to CLECs if the promotion lasts less than 90 days). 47 C.F.R. § 51.613(a). ILECs may impose a restriction not allowed under section 613(a) if they establish that the restriction is reasonable and nondiscriminatory. 47 C.F.R. § 51.613(b). Thus, under the federal regulation, a presumption exists that a condition or limitation on resale is unreasonable or discriminatory.

In addition to regulations, the FCC has issued a number of orders designed to guide those bodies who administer, interpret and enforce the act. Among those orders is *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499 (1996) (Local Competition Order). *See Apple*, 309 F.3d at 715 n. 1. Section VIII of the Local Competition Order contains a discussion of the resale provision. In Paragraph 939, the FCC stated that restrictions on resale are presumptively unreasonable. In Paragraph 948, the FCC concluded section 251(c)(4) does not include any exception for promotional or discounted offerings or for other customer-specific offerings. In Paragraph 951, the FCC concluded the same section of the Act applies to volume based discounts. In Paragraph 953, the FCC explained that, with respect to volume based discounts, requirements that end users meet the volume base are presumptively unreasonable so long as the reseller, the CLEC, "in aggregate, under the relevant tariff, meets the minimal level of demand."

For CLECs, ILECs operate both as a network provider, *see* 47 U.S.C. § 251(c)(3) (duty to provide unbundled access to network elements), and as a provider of wholesale telecommunication services, *see* 47 U.S.C. § 251(c)(4). ILECs are also retail providers for both network access and telecommunications services for their own end use customers. The Act requires carriers to file a schedule of charges for services, known as tariffs.[2] *See AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 216 (1998). State Commissions determine the wholesale discount rate for CLECs from an ILEC's telecommunications services. 47 U.S.C. § 252(d)(3). The wholesale rate discount from Defendant AT&T Michigan's tariffed services is 16.62%.[3]

ILECs will sometimes negotiate individual contracts with specific end users which include discounts from the published tariff prices.[4] Defendant AT&T considers more than a dozen factors when determining whether to offer an ICB to a customer and the price it will offer for the services requested. Those factors include, but are not limited to, (1) the services included in the package, (2) revenue commitment, (3) marketplace prices and the cumulative price differential, (4) prices offered for similar or bundled services, (5) location, (6) loop length, (7) cable complement, (8) availability

---

[2]Defendant AT&T explains, although the list of services offered have traditionally been referred to as tariffs, most of its services have been de-tariffed and are now offered through publically available service catalogs. (AT&T Response Brief at 3 n.3.)

[3]The MPSC established the wholesale discount rates in Case No. U-13531 through orders issued in September 2004 and January 2005. Plaintiffs and Defendant AT&T concur on the relevant discount rates. *See* Plaintiffs' Opening Brief n. 4 on page 12; Defendant AT&T's Response Brief n. 4 on page 9.

[4]These contracts, here called ICBs, *see also MCI Telecomms. Corp. v. GTE Northwest, Inc.*, 41 F.SUpp.2d 1157, 1176 (D. Or. 1999), have also been referred to as "customer specific contracts," *see Bell Atlantic-Delaware, Inc. v. McMahon*, 80 F.Supp.2d 218, 245 (D. Del. 2000), "customer specific pricing agreements," *see AT&T Commc'ns of New Jersey v. Bell Atlantic-New Jersey*, No. 97-cv-5762, 2000 WL 33951473 * 9 (D.N.J. June 6, 2000), and "contract service arrangements, *see AT&T Commc'ns. of the Southern States, Inc. v. BellSouth Telecomms., Inc.*, 7 F.Supp.2d 661, 670 (E.D.N.C. 1998).

of facilities, (9) wire center, (10) timing and current competitive environment, (11) general state of the economy, (12) network architecture or service configuration, (13) quantity commitment, and (14) various risk factors. (Dkt. No. 18-17 Exhibit P to Plaintiffs' Opening Brief - Plaintiffs' Discovery Request Question CL-AT&T-003.) The wholesale discount for the assumption of existing ICBs is 4.34%.[5] The wholesale discount for the resale of existing ICBs to new customers is 5.71%.[6] AT&T currently does not make its ICBs known to CLECs.

## II. BACKGROUND

### A. COMPLAINT FILED WITH MPSC AND ALJ'S PROPOSAL

In their complaint filed with the MPSC, Plaintiffs asserted Defendant AT&T violated federal law by "failing to make certain discounted services available to competitive local exchange carriers ("CLEC") at wholesale rates based upon the actual retail prices paid by AT&T retail customers." (Dkt. No. 24-4 Exhibit C to Plaintiffs' Reply Brief - Compl. ¶ 2.) Plaintiffs alleged Defendant AT&T has a duty under federal law not to impose unreasonable or discriminatory conditions or limitations on the resale of their telecommunications services. (*Id.*) Plaintiffs explained Defendant AT&T offered discounted rates to retail customers that were lower than the lowest wholesale rates available to CLECS. (*Id.* ¶ 3.) Specifically, the complaint alleged Defendant AT&T violated 47 U.S.C. § 251(c)(4) through (1) its "winback" program, (2) its volume discounts, and (3) its term discounts. As part of the prayer for relief on each of the three counts, Plaintiffs requested a mechanism, a password protected website, be established on which Defendant would disclose the prices for services offered through their ICBs.

---

[5]*See* footnote 3.

[6]*See* footnote 3.

The ALJ summarized the various arguments advanced by both parties in his Proposal for Decision. (Dkt. No. 18-12 Exhibit K to Plaintiffs' Opening Brief - ALJ Proposal.) Before addressing Plaintiffs' specific allegations regarding volume and term discounts, the ALJ discussed the propriety of Defendant AT&T's unwillingness to disclose the terms, conditions and pricing in its ICB contracts. (ALJ Proposal at 25-31.) The ALJ concluded Defendant AT&T's failure to disclose the terms and conditions of an ICB was a prohibited restriction. (*Id.* at 28.) At the same time, the ALJ found Defendant AT&T's concerns about confidentiality meritorious and recommended requiring Defendant AT&T to post the terms and conditions of its ICBs on a password protected website.[7] (*Id.* at 29.) The ALJ concluded aggregation of ICB contracts would be unjustified and unworkable. (*Id.* at 36.) The ALJ also rejected Plaintiffs' request that they be allowed to resell ICB contracts to customers who are not similarly situated to the customers for which the ICB was created. (*Id.* at 37.)

B. MPSC ORDER

The MPSC issued an order in which it addressed each of the ALJ's recommendations. (Dkt. No. 1-2 Exhibit 1 to Compl. - MPSC Order.) The MPSC held "the requirement that a customer be similarly situated is reasonable on its face" and concluded the determination of similarity should be addressed in an interconnection agreement so that disputes about the reasonableness of the determination could be resolved through the dispute resolution procedures available in interconnection agreements. *Id.* In response to the Plaintiffs' argument that services could be aggregated to obtain ICB pricing, the MPSC affirmed the ALJ's conclusion that ICBs are subject to a similarly situated condition before Defendant AT&T must permit the ICB to be resold. (*Id.* at 20.)

---

[7]The ALJ recommended adopting a proposal outlined by Dr. Gary Wolfram, a witness for Plaintiffs.

C.  COMPLAINT FILED WITH THIS COURT

Plaintiffs filed an amended complaint with this Court on May 7, 2007.  (Dkt. No. 7 - Amended Compl.)  Plaintiffs allege four errors in the MPSC's Order.  (*Id.* ¶ 6.)  First, Plaintiffs assert the MPSC failed to require Defendant AT&T "to sufficiently offer by regularly disclosing its individual case basis ("ICB") pricing to competitive local exchange carriers ("CLECs")."  *Id.* Second, Plaintiffs assert the MPSC failed to require Defendant to permit CLECs to aggregate volumes to qualify for ICB pricing.  *Id.*  Third, Plaintiffs assert the MPSC failed to require Defendant to treat the CLECs as its customer in the resale context, rather than treating the CLECs' end user as the customer.  Finally, Plaintiffs assert the MPSC failed to find Defendant's requirement that a CLEC's end user must be similarly situated to AT&T's ICB customer to qualify for ICB pricing is unreasonable and discriminatory.  *Id.*

III.  JURISDICTION

Jurisdiction is proper under 28 U.S.C. § 1331 and 47 U.S.C. § 252(e)(6).  *MFS Intelenet,* 339 F.3d at 432.  Section 1331 grants federal district courts general jurisdiction over federal questions. The matter was filed as an original complaint in federal district court alleging a violation of the Telecommunications Act.  Under the Act, a party aggrieved by a determination of a State commission may initiate an action in federal district court to determine whether the underlying agreement reviewed by the commission meets the requirements of section 251 of the act.  47 U.S.C. § 252(e)(6).

IV.  STANDARD OF REVIEW

This action requires the Court to review the decision of an administrative ruling by a state agency, the MPSC.  Such review requires a two-tiered approach.  This Court reviews *de novo*

whether the MPSC's order complies with the requirements of the Telecommunications Act. *MFS Intelenet*, 339 F.3d at 433. "If no illegality is uncovered during such a review, the question of whether the state commission correctly interpreted the [agreement between the carriers] must then be analyzed, but under the more deferential arbitrary-and-capricious standard of review usually accorded state administrative bodies' assessment of state law principles." *Id.* (adopting the standard of review set forth by the majority of federal circuits). Because the issues raised by Plaintiffs question only whether the MPSC's order violates federal law, this Court reviews the issues *de novo*.

## V. ANALYSIS

### A. Does the MPSC Order violate federal law by failing to require Defendant AT&T to disclose the terms and conditions of ICB contracts to CLECs?

The MPSC rejected the ALJ's recommendation concerning disclosure of the terms of Defendant's ICBs. (MPSC Order at 19.) The Commission did not directly address whether Defendant AT&T should be required to disclose information related to its ICBs. The Commission held Defendant must permit an ICB to be resold to the same or another similarly situated customer, but "it is under no obligation to offer a wholesale discount off its discounted prices for components of an ICB contract offered to another individual customer." (*Id.*)

Plaintiffs contend this portion of the MPSC Order violates federal law. Plaintiffs assert several arguments. First, Plaintiffs argue federal law requires wholesale prices offered to CLECs be lower than retail prices offered to ILEC customers. (Plaintiffs' Opening Brief at 7-8.) Under 47 U.S.C. § 252(d)(3), state commissions determine wholesale rates based on the retail rates charged to ILEC customers. At the time the suit was filed, the wholesale rate for CLECs in Michigan was 16.62% off the retail rate offered by ILECs in the tariff or service catalog. Defendant AT&T admits many of the ICB retail prices for its telecommunications services are discounted at a rate greater

than 16.62% off the tariff or catalog rate. (Dkt. No. 18-4 Exhibit C to Amended Compl. - Plaintiffs' Discovery Request Question CL-AT&T-024.)

On the basis of this first argument, Plaintiffs have not established the MPSC Order violates federal law. Defendant's ICB contracts may offer their noncarrier subscribers certain services at rates lower than the 16.62% wholesale discount off the tariff rates. However, Plaintiffs may purchase, at a wholesale discount, the ICBs for resale to either the same subscriber or to a similarly situated subscriber. The wholesale discount for ICBs, set by the MPSC, is 4.34% for the assumption of existing ICBs and 5.71% for ICB contracts offered to new customers. Therefore, the wholesale price of the ICB contract is less than the price offered to Defendant AT&T's subscribers.

Second, Plaintiffs argue Defendant AT&T violates federal law by not disclosing its retail ICB pricing to CLECs. (Plaintiffs' Opening Brief at 8-10.) Section 251(c) of the Act imposes certain obligations on all incumbent local exchange carriers. ILECs have a duty "to offer for resale at wholesale rates any telecommunications services that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A). Plaintiffs explain, because the ICB prices are not disclosed, Defendant does not "offer" ICB pricing for resale, as required by 42 U.S.C. § 251(c)(4)(A). Plaintiffs reason, an offer that is kept secret or not communicated is no offer at all. Defendant does not identify the subscribers with whom it has an ICB. Neither does Defendant publish or otherwise make available the terms and conditions contained in its ICB contracts. Defendant justifies the lack of disclosure on confidentiality clauses contained in the ICBs. Defendant further relies on 42 U.S.C. § 222(a), which imposes a duty on carriers to protect the confidentiality of proprietary information of its customers.

On the basis of this second argument, Plaintiffs have not established the MPSC Order violates

federal law. The Telecommunications Act requires ILECs to "offer" at wholesale rates any telecommunications services it provides at retail. 47 U.S.C. § 251(c)(4)(A). Defendant's failure to disclose information about its ICBs, standing alone, would appear to violate the Act. Although Defendant states it is willing to sell ICBs at wholesale rates, it does not make the terms and conditions of its ICBs known, and thus no actual "offer" is made. Contemporaneously with its duty under section 251 (c)(4)(A), the Telecommunications Act requires Defendant to protect the confidentiality and privacy of the proprietary information of its customers. 47 U.S.C. § 222(a). The Act permits Defendant to use the proprietary information of its customers within the confines of the service relations, but prohibits Defendant from otherwise using, disclosing or allowing access to that information, "except as required by law or with the approval of the customer." 47 U.S.C. § 222(c)(1). *See National Cable & Telecomms. Ass'n v. FCC*, 555 F.3d 996, 997 (DC Cir. 2009). A customer's proprietary network information includes information related to "the quantity, technical configuration, type, destination, location, and amount of use" of that customer. 47 U.S.C. § 222(h)(1)(A).

Plaintiffs' argument must be rejected because it would require Defendant to violate the privacy provision of the Telecommunications Act. Were Defendant required to disclose the terms and conditions of an ICB, the customer's proprietary network information would by necessity also be disclosed. When a customer provides written authorization, the Act does require Defendant to disclose the proprietary information of its customer to a person designated by the customer. 47 U.S.C. § 222(c)(2). Plaintiffs have not alleged Defendant has violated this provision. Plaintiffs argue, in their reply brief, they do not want to assume existing contracts. Rather, Plaintiffs allege they want the information in order to resell an existing ICB to a new customer. Plaintiffs reason,

without any knowledge of the ICBs, they do not have that opportunity. Plaintiffs' difficulty notwithstanding, Plaintiffs' motivation does not justify requiring Defendant to disclose proprietary network information in violation of federal law.

Plaintiffs strategically phrase their argument in terms of Defendant's failure to disclose "ICB pricing." Plaintiffs describe the prices contained in ICBs as "non-tariffed, non-standard retail offerings." (Plaintiffs' Opening Brief at 3.) The phrase "ICB pricing" therefore refers to the cost of a particular telecommunication service provided by Defendant to a subscriber through an ICB. The price of an ICB, however, cannot be understood without the context in which that price is offered. Defendant considers more than one dozen factors when determining whether to offer an ICB and at what price to offer services in that ICB. The ICB discounted prices are uniquely individualized to the customer based on those factors, as opposed to the standard tariff prices offered to everyone. Disclosure of ICB prices would be meaningless absent an explanation of how those prices were set. Providing the proper context for how the ICB prices were established would disclose the terms and conditions of the ICB, which would result in disclosing information about the customer's proprietary network information. *See Nat'l Cable & Telecomms. Ass'n*, 555 F.3d at 997 (customer proprietary network information includes calling plans and special features, the pricing and terms of their contracts for those services and details about who they call and when); *Verizon Northwest, Inc. v. Showalter*, 282 F.Supp.2d 1187, 1189 (W.D. Wa. 2003) (customer proprietary network information includes information about the calls made as well as information about the services to which a customer subscribes). *But see Bell Atlantic-Delaware*, 80 F.Supp.2d at 245-247 (discussing an interconnection agreement through which the ILEC agreed to disclose the material terms of its customer specific contracts in order for CLECs to purchase and resell the contracts to

similarly situated customers, without discussing whether disclosure of such information implicates the privacy protection provisions of the Act).  Accordingly, while Plaintiff may be justifiably frustrated by the operation of the confidentiality provisions of the statute, they nonetheless pertain. Resolution of the conundrum from Plaintiff's perspective must come from the Congress, not this Court.

Third, Plaintiffs assert the requirement that they find an ICB contract through a third party is an unreasonable or discriminatory condition on resale. (Plaintiffs' Opening Brief at 10-11.) Under 47 U.S.C. § 251(c)(4)(B), all local exchange carriers have a duty not to prohibit or impose unreasonable or discriminatory conditions on the resale of telecommunication services.  Plaintiffs framing of their argument notwithstanding, Defendant does not require Plaintiffs find an ICB contract through a third party before Plaintiffs are allowed to resell the ICB.  Plaintiffs can point to no formal policy or requirement that a CLEC must discover the existence of an ICB on their own before Defendant will allow the ICB to be resold. Because federal law prohibits Defendant from disclosing at least some of the information about its customers,  Plaintiffs are placed in the difficult position of having to discover those customers on their own.  Furthermore, Plaintiffs then have to discover, again on their own, the terms and conditions of that ICB.  The situation Plaintiffs find themselves in is not a result of an unreasonable or discriminatory condition on resale imposed by Defendant.  Plaintiffs are forced to discover the ICBs on their own because of the privacy provisions found in the Telecommunications Act.

Fourth, Plaintiffs argue, because Defendant does not disclose its ICB prices, the MPSC does not have access to all information necessary to determine the retail rate actually charged.  (Plaintiffs' Opening Brief at 11.)  As a result, Plaintiffs assert, the MPSC has not fulfilled its obligation under

47 U.S.C. § 252(d)(3) to "determine the whole sale rates on the basis of retail rates charged." Plaintiffs' argument here functions as a collateral attack on the MPSC's determination of the appropriate wholesale discount for existing ICBs. The MPSC ruling at issue does not establish the wholesale discount for existing ICBs. Whether the MPSC should have had access to Defendant's ICB prices when it set the wholesale discount is not relevant to the order at issue here.

Fifth, Plaintiffs infer the MPSC's Order violates federal law because, by failing to disclose the retail rates offered through ICBs, the proper retail rate cannot be determined. (Plaintiffs' Opening Brief at 14.) A determination of the proper retail rate is essential to creating competition because the wholesale rate is calculated on the basis of the retail rate. *BellSouth Telecomms. v. Sanford*, 494 F.3d 439, 445 (4th Cir. 2007). *Sanford* involved promotional offers lasting more than ninety days. *Id.* at 442. The ILEC did not extend the offer to competing providers for resale. *Id.* The Fourth Circuit Court of Appeals upheld the State Commission's determination that the promotional offering, because it lasted more than 90 days, was a standard retail offering which must be subject to resale at the wholesale rate. *Id.* at 452-453. The court further noted the State Commission invited BellSouth to show the restriction on resale was pro-competitive, reasonable and not discriminatory. *Id.* at 453.

On this basis, Plaintiffs have not established the MPSC's Order violates federal law. Unlike the situation in *BellSouth*, Defendant AT&T does not refuse to allow the discounted offering, in this case the ICB, to be resold. The wholesale discounts available for the resale of ICBs undermines Plaintiffs' assertion that Defendant AT&T's failure to disclose the rates it charges through ICBs is anticompetitive.

**B. Does the MPSC Order violate federal law by failing to require Defendant AT&T Michigan to permit CLECs to aggregate service to qualify for ICB**

**pricing?**

The MPSC affirmed the ALJ's proposed decision that ICB contracts are subject to the "similarly situated" requirement before an ICB may be resold. (MPSC Order at 20.) The MPSC ruling permits Defendant AT&T to look beyond the CLEC to the end user in order to determine similar situatedness. The MPSC concluded "resale service is service provided to a particular customer" and noted volume and term of contract were not the only determination of price. (*Id.* at 21.)

Plaintiffs argue the MPSC Order violates federal law. Plaintiffs assert, under the Telecommunications Act, ILECs cannot refuse to offer services to CLECs for resale on the condition that a certain volume of those services are purchased unless the ILEC allows the CLEC to aggregate the volume of services used by the CLEC's end users. Plaintiffs argue CLECs should be able to purchase for resale any volume based discounts contained in ICBs. Defendant counters that Plaintiffs conflate the phrases "retail services" and "tariffed services." Defendant further asserts there are important differences between aggregation of end users to qualify for a volume discount off tariffed services and aggregation of end users to qualify for the retail services offered in an ICB. Defendant also argues Plaintiffs' position conflates the phrases "volume pricing" and "ICB pricing." Defendant asserts Plaintiffs' position makes sense only if volume was the only factor considered in the pricing of an ICB.

The Act requires Defendant AT&T to offer for resale at wholesale rates any telecommunications service it provides to noncarriers, "including contract and other customer specific offerings." *Local Competition Order* ¶ 948. *See* 47 U.S.C. § 251(c)(4). Federal regulations create a presumption that restrictions on resale, other than those specifically enumerated, are

presumptively unreasonable unless the ILEC proves to the State Commission the restriction is reasonable and nondiscriminatory. *See* 47 C.F.R. § 51.613(b). It is presumptively unreasonable for an ILEC to require a CLEC's end user to comply with the ILEC's volume requirement "so long as the reseller, in aggregate, under the relevant tariff, meets the minimal level of demand." *Local Competition Order* ¶ 953. However, the Act does not require an ILEC to offer a wholesale discount on services it does not offer to its own retail customers. *Apple*, 309 F.3d at 718. When an ILEC places limitations on the service it provides its end user, a CLEC purchasing the service at a wholesale discount must resell the service with the same limitation. *Id.* at 720.

In *Apple*, the ILEC offered an optional toll calling plan which allowed customers to make unlimited calls within a specific geographic radius for a flat fee. *Id.* at 716. However, the plan was offered only to single users and prohibited multiple users from sharing one plan. *Id.* The ILEC sought to impose the limitation on the plaintiff CLEC, which would require the CLEC to sell only one plan to one customer. *Id.* The plaintiff brought suit alleging the condition was an unreasonable restriction on resale. *Id.* The State Commission found in favor the ILEC, but the district court disagreed, holding the condition was a restriction on resale and the ILEC had not overcome the presumption of unreasonableness. *Id.* at 716-717. The Tenth Circuit Court of Appeals reversed, holding that the plaintiff CLEC may purchase the service from the defendant ILEC under the wholesale provision "and resell them subject to the same single-user limitation that [the ILEC] is subject to when it sells [the service] at retail." *Id.* at 720. The court rejected the plaintiff's assertion that the single-user limitation prevented it from realizing high volume discounts. *Id.* The court explained the "prohibition on aggregating end-user traffic" did not prevent the plaintiff from buying the service in bulk at a discount, so long as the volume discount was offered by the defendant to its

customers, "and selling them individually, subject to the same use limitations as [the ILEC] sells them." *Id.* The court concluded the plaintiff CLEC was attempting to change the nature of the service offered by the ILEC. *Id.*

On this point, Plaintiffs have not established the MPSC Order violates federal law. An ICB is distinct from a tariffed service because of its individualized nature. Defendant is correct that tariffed services are distinct from retail services. The services provided through an ICB may be retail services, but they are not necessarily tariffed services. The Local Competition Ruling addresses volume discounts related to tariffed services. The Local Competition Ruling does not speak to the aggregation of ICBs or services provided through an ICB. Services provided through an ICB are customized to the unique demands and needs of a particular subscriber and are priced accordingly. Defendant is thus also correct that volume pricing and ICB pricing are distinct.

When ICBs are negotiated, Defendant AT&T considers multiple factors before offering a price for the service provided. One consideration, which may play a prominent factor, is volume. However, even if volume factors prominently in the pricing calculation, it is not the only consideration. *See AT&T Commc'ns.*, 7 F.Supp.2d at 673. This Court agrees with Defendant AT&T and the MPSC that the reasoning in *Apple* applies here. Should Plaintiffs be allowed to aggregate its end users to qualify for a volume discount in an ICB, it would force Defendant AT&T to offer, at a wholesale discount, a retail service it does not offer to its own customers. Such an outcome finds no support in federal law. Plaintiffs may purchase multiple ICBs at a volume discount, assuming a volume discount is offered by Defendant AT&T to its own customers, and resell the ICBs individually, subject to the same terms and conditions Defendant AT&T imposes on its own customers. In this case, the terms and conditions are the combination of services customized to the

ICB subscriber's needs. In other words, Plaintiffs' end users will need to be similarly situated to the subscriber with whom Defendant AT&T negotiated the ICB.

### C. Does the MPSC Order violate federal law by failing to require Defendant AT&T to treat CLECs, rather than the CLECs' end users, as its customers in the resale context?

In raising this issue, Plaintiffs cite the following passage from the MPSC Order: "The Commission is not persuaded that AT&T Michigan must not look beyond the CLEC for the customer receiving service. Resale service is service provided to a particular customer . . . . Those customers that are substantially similar should be granted the resale of an ICB." (Plaintiffs' Opening Brief at 22 (citing MPSC Order at 20-21).) Plaintiffs explain Defendant AT&T treats the CLEC's end users as AT&T's own customers when AT&T "(1) refuses to permit CLECs to aggregate its end user volumes to qualify for ICB pricing discounts (see § II.C above) and (2) requires the CLECs' end users to be 'similarly situated' to AT&T Michigan's ICB customer in order to qualify for ICB pricing (see § II.E below)." *Id.* Plaintiffs argue Defendant AT&T's approach, and thus the MPSC Order, violates both Section 251 (c)(4)(A) of the Act as well as 47 C.F.R. § 15.603. The Federal Regulation requires local exchange carriers to "provide services to requesting telecommunication carriers for resale that are equal in quality, subject to the same conditions, and provided within the same provisioning time intervals" that the local exchange carrier provides to others, including its own end users. 47 C.F.R. § 15.603(b).

Plaintiffs fail to establish the MPSC order violates federal law. The two examples provided by Plaintiffs have been resolved against Plaintiffs. This third issue merely rewords arguments raised elsewhere. The distinction Plaintiffs attempt to make, the focus on the end users, is not a distinction that makes a difference under federal law, at least in this regard. If, for example, federal law does

not require Defendant to allow Plaintiffs to aggregate the end users to qualify for an ICB, then federal law also does not require Defendant to treat the CLEC as its end user rather than the CLEC's end user.

### D. Does the MPSC Order violate federal law because there was no evidence in the record to justify the conclusion that Defendant AT&T's "similarly situated" requirement was reasonable and nondiscriminatory?

In the portion of its Order addressing ICB contracts, the MPSC rejected the ALJ's recommendation and stated when Defendant AT&T "enters into a contract, it must permit that contract to be resold either to the same customer or to a similarly situated one." (MPSC Order at 19.) The next paragraph of the order begins "The requirement that a customer be similarly situated is reasonable on its face." (*Id.*) The MPSC recommends establishing a procedure for determining similarity through an interconnection agreement. (*Id.*)

Plaintiffs argue the MPSC's conclusion, the requirement that a customer to be similarly situated is reasonable on its face, violates federal law. Plaintiffs argue the requirement that a prospective end user be similarly situated violates both 47 U.S.C. § 251(c)(4) and 47 C.F.R. § 51.613(b). Plaintiffs explain the requirement constitutes a condition or limitation on the resale of a telecommunication service. Plaintiffs assert any condition or limitation on resale is presumed unreasonable and discriminatory, until Defendant AT&T establishes otherwise. Plaintiffs argue the MPSC's holding effectively insulates Defendant AT&T's internal review process from review by either the Commission or a competitor.

Defendant AT&T identified more than one dozen factors it considers when deciding whether to offer an ICB and the price for the services offered. (Dkt. No. 18-21 Plaintiffs' Exhibit P.) Defendant AT&T concedes those factors are not exhaustive and that "additional factors could come

into play, including factors of which AT&T Michigan is not currently aware." (Plaintiffs' Exhibit T - Defendant's Response to Request for Admission No. 4.) Defendant AT&T provided a list of similar factors it considers when determining whether a prospective end user is similarly situated to an existing end user. The factors considered include, but are not limited to,

> -Whether the prospective customer has the same class of service (i.e., residential vs. business);
> -Whether the prospective end user is purchasing the same services;
> -Whether the cost-impacting aspects of the configuration of services are the same;
> -Whether the geographic location is comparable, e.g., whether the prospective end user is in the same Access Area as the existing end user;
> -Whether distance-sensitive components are present, whether the distance to the prospective end user's location are the same;
> -Whether the prospective end user is willing to comply with the terms and conditions of the existing ICB, such as installation intervals, volume commitments, termination liability, contract terms and contract provisions.

(Dkt. No. 18-22 Plaintiffs' Exhibit U - Defendant's Response to Question No. CL-AT&T-048.) Plaintiffs argue, based upon Defendant's description of the procedure used to determine similarity, the similarly situated requirement is unfettered, unreviewable, and consequently unreasonable.

AT&T and the MPSC offer several responses. Defendant AT&T argues the nature of an ICB requires any potential customer be similarly situated to the existing customer before the ICB can be resold. Because the pricing of services in an ICB is contingent on a variety of factors unique to that customer, the same factors need to be present in the potential customer before the ICB may be resold. The MPSC characterizes this portion of its Order as "simply acknowledg[ing] that regulating commissions and courts have long recognized that customers must be similarly situated to receive the unique pricing and other terms and conditions offered to a particular customer or class of customers." (MPSC Response Brief at 8.) The MPSC argues Plaintiffs' complaint never asserted the similarly situated requirement was unreasonable and the issue was not raised until the briefing

stage of MPSC proceedings. Both Defendant AT&T and the MPSC argue Plaintiffs' position ignores an important part of the MPSC's decision. The MPSC specifically found the process for determining whether a customer is similarly situated is a proper subject for an interconnection agreement.

Plaintiffs' claim here raises two separate issues which must be carefully distinguished. First, Plaintiffs assert the requirement that a potential customer be similarly situated to an existing ICB customer is a condition on resale of the ICB, and that the condition is unreasonable and discriminatory. Second, Plaintiffs assert the process by which the similarities of the two parties are determined is also a condition on resale. Plaintiffs assert this second condition is also unreasonable and discriminatory. Both the ALJ and the MPSC observed this distinction by the manner in which they addressed the two issues. The ALJ found the similarly situated requirement to be long-standing and noted the more "fundamental and crucial question" was the standard by which the similarities, or lack thereof, would be determined. (ALJ Proposal at 37.) The MPSC discussed the similarly situated requirement in the section of the order regarding aggregation (MPSC Order at 20) and discussed the procedure for determining similarities in the section of the order regarding the burden of proof (*Id.* at 22.)

On the first issue, Plaintiffs have not established the MPSC Order violates federal law. The requirement that a potential customer be similarly situated to an existing ICB customer before the ICB may be resold is not a condition on the resale of an ICB. If the requirement is not conditioned on resale, then it does not violate either section 251(c)(4) of the Act or section 613(b) of the Federal Regulation. Rather, it is a requirement that the same ICB be resold rather than a different ICB. *See Apple*, 309 F.3d at 717-718. As explained above, when the potential customer is not similarly situated to an existing customer, the service provided to the existing customer will not be the same

service provided to the potential customer to whom the CLEC wishes to resell the ICB. ICBs are unique services designed for a particular customer based on that customer's needs, location, technologies, as well as the volume and duration of the contract. When the potential customer of the CLEC does not have the same characteristics as the existing customer for whom the ICB was created, the service provided will not be the same.

With regard to the second issue, the process by Defendant AT&T determines whether two parties are similarly situated, Plaintiffs have not established the MPSC Order violates federal law. Defendant's procedure for determining whether the prospective customer is similarly situated to the existing customer is not part of the ICB the CLEC is attempting to resell. Defendant's requirement that it find that two customers be similarly situated, through its own internal procedures, thus constitutes a condition or limitation on the resale of a retail service offered to its customers. Accordingly, Defendant must establish the procedure is reasonable and nondiscriminatory under the Act and the Federal Regulation. The record does not establish that Defendant has proven its internal review procedures are reasonable and nondiscriminatory. However, neither the ALJ nor the MPSC found that the procedure by which Defendant determines whether two customers are similarly situated was reasonable and nondiscriminatory. Both the ALJ and the MPSC expressed reservations about the Defendant's procedure. The MPSC recommended the process for determining whether two customers are similarly situated be provided for through an interconnection agreement. (MPSC Order at 22.) *See Bell Atlantic-Delaware*, 80 F.Supp.2d at 245-247. Plaintiffs' complaint filed with the MPSC did not raise as an issue Defendant AT&T's similarly situated requirement nor did it allege the process by which Defendant AT&T determines similar situatedness was an unreasonable

or discriminatory condition on resale.[8]

At the hearing, Defendant AT&T argued its similarly situated requirement was mandated by the requirement in 47 C.F.R. § 51.603(b). As explained above, the similarly situated requirement, upheld as reasonable by the MPSC, merely requires Defendant AT&T offer the same service for resale that it offers to its own customers. The similarly situated requirement defines the duty of the ILEC; it is not a condition on resale. In their post hearing brief, Plaintiffs argue 47 C.F.R. § 51.603(b) does not justify Defendant AT&T's similarly situated requirement. (Plaintiffs' Post Hearing Brief at 6-12.) Plaintiffs advance three arguments. First, Plaintiffs explain Defendant does not impose the similarly situated condition on its own customers, only on resale customers. Plaintiffs are partially correct and partially incorrect. Plaintiffs are partially correct because no determination of similarity is made when the ICB is offered by Defendant to its own end user. However, the word "similarly" modifies the word "situated." Plaintiffs are incorrect that Defendant does not make a determination of its own end users situation before offering an ICB. The decision to extend an ICB to a particular customer necessarily includes a determination of that customer's situation, i.e., that customer's location, service needs, etc. When the ICB is negotiated, the terms and conditions hinge on how the customer is "situated." Plaintiffs argument here ignores the obvious meaning of the word "similarly." In order for the regulation's duty of resale on the ILEC to pertain, the "services" sought must be of "equal in quality" and "subject to the same conditions". Absent those congruities, the

<hr />

[8]The question of when this issue was first raised is discussed by both parties at various points in the briefs submitted to the Court. Various sentences in Plaintiffs' initial complaint to the MPSC are worded broadly and do state that Plaintiffs general complaint about conditions on resale. However, nowhere in the complaint do Plaintiffs state, infer, suggest or otherwise argue they should be able to resell ICBs to customers who are not similarly situated. Nor do Plaintiffs raise the issue of how similar situatedness is determined as an issue in the complaint to the MPSC. In their response brief, the MPSC explains the similarly situated requirement was first raised by Plaintiffs in Plaintiffs' briefs to the MPSC. (MPSC Response Brief at 8.)

ILEC has no duty to provide the service. In other words, the "similarly situated" requirement demands the ICB to be resold is the same service Defendant AT&T offers its own customer.

Second, Plaintiffs argue even if the conditions are imposed on Defendant AT&T's customers, imposing those same conditions on resale runs contrary to other statutory provisions and regulations. For the reasons outlined above, Plaintiffs' argument here is simply incorrect. Defendant AT&T's requirement that the customer to whom the ICB is resold is similarly situated to AT&T's end user is simply a means of assuring the service being resold is the same service AT&T offers and that a CLEC is not changing the nature of the service. *See Apple* 309 F 36, at 720.

Finally, Plaintiffs argue the similarly situated requirement violates 47 C.F.R. 51.603(b) because of the process by which Defendant AT&T determines whether two parties are similarly situated. As explained above, neither the ALJ nor the MPSC held that Defendant AT&T's procedure by which it determined whether two parties were similarly situated was reasonable and nondiscriminatory.

Having affirmed the MPSC ruling that the similarly situated requirement conforms to federal law, a remaining question centers on the parameters of factors which AT&T may lawfully consider in determining similarly situatedness. In this regard, the court adopts the well-reasoned approach adopted by Judge Robinson in *Bell Atlantic-Delaware v McMahon*, 80 F. Supp 2d 218, 246-247 (D. Del 2000). Adopting the vehicle of the Interconnection Agreement in that case, the Court held, "the Interconnection Agreement's approach to determining which terms are material, and which are not, is both sensible and in keeping with the Telecommunications Act and the Local Competition Order". *Id*. at 247.

Specifically, the agreement at issue in that case adopted specific and general standards which

this Court, concurring with Judge Robinson, also views as consistent with the Act and the Local Competition Order. As authorized, the court finds these standards to be reasonable and non-discriminatory.

If AT&T seeks broader standards, it must satisfy the MPSC of their reasonableness and non-discriminating nature. The Court expresses no view on this record whether the factors utilized by AT&T satisfy the general and specific standards set forth above. In the absence of agreement of the parties, that is a matter for the MPSC.

## VI. CONCLUSION

Having conducted a *de novo* review of the issues raised by Plaintiffs, this Court finds the MPSC Order at issue does not violate federal law. This Court recognizes and echos the concerns expressed by both the ALJ and the MPSC regarding Defendant AT&T's internal review procedure for determining whether two entities are similarly situated for the purposes of the resale of an ICB. As explained above, the procedure should be negotiated as part of an interconnection agreement.


Date:   August 28, 2009                              /s/ Paul L. Maloney
                                                     Paul L. Maloney
                                                     Chief United States District Judge